# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA
## Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 1:21-CR-192 |
| ) | Hon. Leonie M. Brinkema |
| JON KARL MCREE FLEET, ) | Sent Hr'g: February 15, 2022 |
| ) | |
| ) | |
| Defendant. ) | |

## MR. FLEET'S MEMORANDUM IN AID OF SENTENCING

On February 15, 2022, Mr. Fleet will appear before the Court for sentencing. Pursuant to Rule 32 of the Federal Rules of Criminal Procedure and this Court's Policy Regarding Procedures to be Followed in Guideline Sentencing, Mr. Fleet, through counsel, states that he has received and reviewed the Presentence Investigation Report ("PSR") prepared in this case and that he has no objections to the PSR.

Mr. Fleet has been found guilty, on a plea of guilty, of two counts of brandishing a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c). The maximum penalties for the first count are a period of imprisonment of seven years to life, a fine of $250,000, full restitution, and five years of supervised release. The maximum penalties for the second count are period of imprisonment of ten years to life, a fine of $250,000, full restitution, and five years of supervised release.

For the reasons given below, and in light of the entire record, Mr. Fleet joins the government's sentencing recommendation, and respectfully submits that a

sentence of 17 years of incarceration, the statutory mandatory minimum, coupled with a period of supervised release, will be sufficient to achieve the goals of sentencing in this case as required by 18 U.S.C. § 3553.

**I. The Guidelines are only one of several factors relevant to the Court's determination of what sentence is sufficient but not greater than necessary to achieve the goals of sentencing.**

The appropriate punishment in every case must be designed to "fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). The Sentencing Guidelines remain in tension with this principle, and do a particularly poor job of incorporating a person's history and characteristics in the determination of an appropriate sentence. Indeed, on this point they contradict the law. *See* U.S.S.G. § 5H1.1 et seq. (contending that education, vocational skills, employment record, family ties, age, health, and socio-economic status are generally irrelevant to sentencing even though § 3553(a)(1) expressly requires sentencing courts to consider such factors).

It is now "emphatically clear" that the "Guidelines are guidelines – that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). The Court must keep in mind that, as the Department of Justice recently noted, determining the Guidelines range is no substitute for an independent determination of a sentence that is "appropriate [and] serve[s] the interests of justice." *See* Gov't

Supp. & Amend. Sent. Mem., *United States v. Roger J. Stone, Jr.*, Case No. 19-cr-18-ABJ, Dkt. No. No. 286 (D.D.C. Feb. 11, 2020) (requesting a sentence "far less" than the "technically applicable" Guideline range, which can result in advisory sentencing ranges that are "unduly high," "excessive and unwarranted under the circumstances," and insufficiently reflective of the other § 3553(a) factors); *see also Nelson v. United States*, 555 U.S. 350 (2009); *Spears v. United States*, 555 U.S. 261 (2009); *Kimbrough v. United States*, 552 U.S. 85 (2007); *Gall v. United States*, 552 U.S. 38 (2007),

As the Court explained in *Nelson*, "[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable." 555 U.S. at 352. "The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Id.* Thus, after evaluating the Guidelines along with the other co-equal sentencing factors set forth in 18 U.S.C. § 3553(a),[1] a sentencing court may find that the case falls outside the "heartland" contemplated by the Guidelines, or that "the guidelines sentence itself fails properly to reflect the § 3553(a) considerations," or that "the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007); *United States v. Booker*, 543 U.S. 220, 259-60 (2005).

Ultimately, the central mandate of § 3553(a) requires district courts to impose

---

[1] These other factors are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the kinds of sentences available, (3) the need to avoid unwarranted sentencing disparities, (4) the need for restitution, and (5) the need for the sentence to reflect: the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. 18 U.S.C. § 3553(a).

3

a sentence "*sufficient, but not greater than necessary*" to comply with the purposes of sentencing set forth in § 3553(a)(2). This requirement is not just another factor for the Court to consider along with the others set forth in § 3553(a). Rather, it sets an independent limit upon the sentence.

## II. The Court should give little deference to the Career Offender Guideline.

The PSR calculates Mr. Fleet's advisory sentencing guideline range to be 262-327 months based on Mr. Fleet's designation as a career offender. Pursuant to the Guidelines Section 4B1.1(a), a defendant is designated a career offender and subject to a sentence enhancement if: (1) he or she was at least eighteen years old at the time of the instant offense; (2) the instant offense is a felony crime of violence or controlled substance offense; and (3) he or she has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

Regardless of whether the career offender guideline is appropriately calculated – which is not disputed in this case – sentencing courts have the choice whether to sentence an individual within, above, or below the career offender range, consistent with the other factors in 18 U.S.C. § 3553(a). With this flexibility, the consistent message from judges has been that the punishment under this guideline is inappropriately severe for a great many defendants subject to it. In coming to this conclusion, one of the things courts have considered is that, since at least 2004, the United States Sentencing Commission identified the career offender guideline as a source of significant, unwarranted adverse impact on Black individuals sentenced in

4

federal court.[2] The Commission suggested that Black individuals are more often "subject to the severe penalties required by the career offender guideline."[3]

Across the country, in fiscal years 2016 to 2020, there were 8,058 career offender cases. Of the 8,058 cases, 4,883 (60.7%) of the career offenders were Black, 1,737 (22.6%) were White, 1,268 (15.2%) were Hispanic, and 158 (1.4%) were Other races.[4] This percentage is particularly high considering Black individuals only make up 19.1% of all prosecutions in fiscal year 2020, and this percentage is "largely unchanged" from prior years.[5]

---

[2] *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform*, United States Sentencing Commission, 113, at 133 (2004)(Addressing the effect of the Career Offender Guideline)("U.S.S.C. Report") *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf

[3] *Id.*

[4] Individual Offender Datafiles, United States Sentencing Commission, (FY2016 – FY 2020), https://www.ussc.gov/research/datafiles/commission-datafiles. *See also* 2020 Annual Report and Sourcebook of Federal Sentencing Statistics, United States Sentencing Commission, at 54, (last visited Feb. 8, 2022) https://www.ussc.gov/sites/default/files/pdf/research-and- -publications/annualreports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf.

[5] 2020 Annual Report and Sourcebook of Federal Sentencing Statistics, United States Sentencing Commission, at 7 (last visited Feb. 8 2022) https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annualreports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf.



Based on the racially disparate impact of the guidelines, as well as other policy considerations and required consideration of 3553(a) factors, judges have varied from the career offender guideline significantly. Indeed, in fiscal year 2019, district judges imposed sentences within the guideline range on just 22.6% of those deemed career offenders.[6]

With respect to Mr. Fleet's case, it also merits attention that 12 of his 14 criminal history points, and the offenses that form a predicate for his career offender designation, are due to incidents that all occurred within several (six) weeks of each other. As detailed below, Mr. Fleet battled with substance abuse since his teenage years. At times during his life, his primary focus was obtaining money to buy drugs, buying drugs, and using those drugs. During the final weeks of 2000, Mr. Fleet lost

---

[6] U.S.S.C., Individual Datafiles FY2019.

his job with R&S Springworks in Bladensburg, Maryland. Without steady employment, Mr. Fleet could not support his drug habit. Consequently, Mr. Fleet sought to obtain money illegally by robbing commercial businesses. Between December 2000 and mid-January 2001, Mr. Fleet robbed several businesses in Maryland. While this does not excuse Mr. Fleet's offenses, for which he takes full responsibility, it does provide context for the spate of robberies that occurred during those six weeks, and which directly contributed 12 criminal history points and resulted in his career offender designation. Had the offenses been charged together (i.e. federally, as was the case with Mr. Fleet's instant case), Mr. Fleet would have received three – not 12 – criminal history points for all offenses. Similarly, he would only have one – rather than two – countable, prior conviction for a crime of violence, making the career offender designation inapplicable.[7]

Accordingly, because of the overly severe nature of the career offender guideline, its racially disparate impact, and its application in Mr. Fleet's case, Mr. Fleet submits that the advisory guideline range in this case should be afforded little deference.

---

[7] The remaining two criminal history points stem from Mr. Fleet's 2015 conviction for unauthorized use of a vehicle and receiving stolen property, neither of which "has as an element the use, attempted use, or threatened use of physical force against the person of another, or is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as defined in 18 U.S.C. § 841(c)" as is required to be considered a crime of violence. U.S.S.G § 4B1.2(a)(2).

7

**III. The proposed sentence is appropriate in light of Mr. Fleet's personal background and characteristics and the nature and circumstances of the offense.**

Mr. Fleet grew up in Upper Marlboro, Maryland, with his brother and four sisters in a household where he and his siblings' needs were often not met due to his mother's struggles with alcohol abuse. Evaluation of Dr. Jonathan DeRight ("DeRight Evaluation"), attached as Exhibit 1, at 2 (filed under seal). Indeed, at times she lost money while drinking and playing cards and then was unable to pay for her children's basic necessities, including food, household bills, and water. *Id.* With neither his biological father or stepfather involved in his life, his aunt and grandparents also took on caretaking roles. Devastatingly, Mr. Fleet's aunt was murdered by his uncle when Mr. Fleet was approximately 11 or 12 years old. Her untimely death caused a great deal of turmoil and stress within the family. DeRight Evaluation at 3. The trajectory of Mr. Fleet's life shifted tremendously after this tragedy, and the next decades would become a vicious cycle of substance use, untreated mental health issues, and long periods of incarceration. He is now 62 years old and has served over 30 years of his life in prison. PSR, ¶ 84.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████ He became more isolated, had trouble sleeping, and his schoolwork suffered as a result. Mr. Fleet began working around the age of 15 to help provide for his family. DeRight Evaluation at 3. Ultimately, he dropped out of school after the ninth grade to work more. Around

8

the same time, he began using drugs ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and by age 19, he was using heavily to cope with the stress and trauma he endured from his aunt's passing. DeRight Evaluation at 3-4.

With limited structure at home, in addition to being unable to support his addiction through his sporadic and limited employment, Mr. Fleet surrounded himself with negative peer groups and individuals who taught him how to make quick money. He began by committing petty thefts and eventually started robbing others. In his early 20s, these actions eventually led to him being arrested and serving his first significant amount of incarceration. DeRight Evaluation at 3. He was eventually paroled, but by this time, Mr. Fleet was in his forties and struggled to find a decent job given his criminal record, education level, and inexperience. Furthermore, he lacked the resources to obtain appropriate treatment for his mental health and substance abuse issues once returning to the community. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. His inability to cope with these stressors again led to him abusing illicit substances. Within two years, he returned to prison for similar conduct. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Nevertheless, upon his release in 2013, Mr. Fleet faced obstacles with reentry. Although his family helped when they could, providing him shelter if he needed or including him in family functions, their support was limited because they had

9

established their own lives by that time. ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████. Using drugs was the only way he knew how to cope, albeit temporarily, with these feelings. For years, Mr. Fleet dedicated most of his days to obtaining and using drugs. DeRight Evaluation at 4. He used various drugs throughout his life, but upon release from prison, he gravitated towards heroin, ████████████████████████████████████████████████████. DeRight Evaluation at 4. The use of opiates would quickly consume his life and he functioned only to support his addiction, leading to the instant offense.

Even though Mr. Fleet was employed by Bel Air Produce as a truck driver and self-employed doing odd jobs in construction and metal scrapping, his income was low. PSR ¶¶ 96-97. Once again, in January 2021, he found himself in a position where he was unable to afford his drug habit with his legal employment. As such, he financed his addiction with a string of robberies of commercial establishments in Maryland and Northern Virginia. During some of the robberies, Mr. Fleet brandished

---

[8] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

a firearm. He has accepted responsibility for this conduct by pleading guilty, and he is prepared to accept the punishment of the Court.

Although Mr. Fleet has been incarcerated previously, he has never been detained within the Bureau of Prisons ("BOP"). As such, the programming available to him for mental health and substance abuse issues has been less extensive or nonexistent. Furthermore, Mr. Fleet has never had the benefit of proper mental health or substance abuse treatment outside of incarceration. PSR, ¶ 84. Yet, there is no doubt Mr. Fleet is amenable to mental health treatment. In fact, he has been prescribed and has continued to follow his medication regimen for the entirety of his incarceration for the instant offense. DeRight Evaluation at 3. As substance use has also been a significant struggle for Mr. Fleet, he would benefit greatly from the Residential Drug Abuse Program ("RDAP") while incarcerated in addition to other BOP programs, including the Challenge Program, for individuals with both mental health and substance abuse issues. DeRight Evaluation at 8. Treatment programming is significant because Dr. DeRight emphasizes that both treatments, in addition to post-release planning, such as that offered through the 18-month Life Connections program, have been identified as strong factors in reducing recidivism for individuals, like Mr. Fleet, who deal with co-occurring disorders (i.e. mental illness and substance abuse). DeRight Evaluation at 8.

IV. **Several factors demonstrate that more than 17 years of incarceration is not necessary to promote the goals of sentencing.**

Undoubtedly, the offenses to which Mr. Fleet pleaded guilty are extremely serious. Additionally, Mr. Fleet accepted responsibility for several robberies of

commercial establishments. Although no one was injured in the robberies and Mr. Fleet never intended to physically harm anyone, he recognizes the potential risk whenever a firearm is present. As such, he will receive a significant punishment. It is evident that the seriousness of the offenses is accounted for in the mandatory minimum sentence that must be imposed. Seventeen years is a long time. Indeed, even assuming credit for good behavior, on a sentence of 17 years, Mr. Fleet will serve longer for these offenses than he served on his prior sentence. Such a lengthy sentence will protect the public and stand as a significant deterrent for Mr. Fleet.

Age also plays a role in the deterrence determination. After serving a sentence consistent with the joint recommendation, Mr. Fleet will be in his mid-70s. Based on his age, education, sex, and current health conditions, his likelihood of incurring dementia is significantly higher than the general population.[9] Consequently, any desire or ability to commit a criminal offense will be entirely limited by his age and physical limitations. Indeed, studies have found older defendants are significantly less likely to reoffend than younger defendants.[10] The risk of recidivism drops consistently as a defendant ages.[11] While this ultimately means there are fewer

---

[9] DeRight Evaluation at 3.
[10] *See Measuring Recidivism: The Criminal History Computation of Federal Sentencing Guidelines*, United States Sentencing Commission at 28 (May 2004).
[11] Age & percent recidivating for all Criminal Histories within 24 months:
Under 21:   35.5%
21 to 25:   31.9%
26 to 30:   23.7%
31 to 35:   23.8%
36 to 40:   19.7%
41to 50:    12.7%
Over 50:     9.5%
*Id.*

defendants over the age of 50 to study, it is clear that the rate declines as one ages, and it is reasonable to assume that trend continues with adults in the higher age ranges as well.

While it can certainly be pointed out that Mr. Fleet's current conviction occurred after the age of 60, the fact remains that every few years of aging correlates with a reduced likelihood of committing another offense. In other words, although he may have been later in life when he committed the instant offense, Mr. Fleet will nevertheless be significantly older when he is released. Accordingly, the risk of him reoffending continues to diminish.

Further, age impacts how Mr. Fleet will experience his incarceration, particularly now during the coronavirus pandemic. Mr. Fleet's age and health conditions put him at increased risk for severe illness or death.[12] The risk for severe illness from COVID-19 increases with age, with older adults at the highest risk. "The number of deaths among people over age 65 is 80 times higher than the number of deaths among people aged 18-29."[13] In addition, the CDC explicitly states that "[l]iving in prisons and jails puts you at higher risk for getting COVID-19" because of the difficulty in taking preventive measures in such settings.[14] The best way to

---

[12] "People with Certain Medical Conditions." Centers for Disease Control and Prevention, 22 October 2021, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Feb. 8, 2022).
[13] *Id*.
[14] CDC, *People living in prisons and jails*, available at: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/living-prisons-jails.html (last updated Dec. 7, 2021).

13

prevent illness is to avoid exposure to the virus, which requires social distancing (staying at least 6 feet away from others), wearing a mask, and avoiding crowds.[15] Complying with the CDC's guidelines is all but impossible in a crowded prison environment.

Relatedly, due to the ongoing COVID-19 pandemic, conditions of confinement have been unusually hard for the duration of Mr. Fleet's pretrial detention. As a result of the pandemic, inmates have been frequently kept in isolation, lacking much-needed social interaction. The conditions of his incarceration have ranged from grueling to tortuous, especially given the recent explosion of cases related to the Omicron variant. Throughout his incarceration, there were no personal visits from friends and family, no classes, and no group programs. Most opportunities for recreation have been strictly curtailed. A sentence of 17 years—the last nine months of which have been spent in substantially more punishing conditions than existed prior to the pandemic—constitutes a just punishment and more than an adequate general deterrent.

Moreover, the notion that significant incarceration is necessary to achieve general deterrence is not supported by empirical research. "Increases in the severity of punishment do not yield significant marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). Instead, it is the certainty of punishment that offers greater deterrence than the severity of

---

[15] *See* CDC, *Protect Yourself*, available at: https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

punishment. *See* Zvi D. Gabbay, *Exploring the Limits of Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

Finally, the sentence recommended by the parties allows more than sufficient time for Mr. Fleet to avail himself of several rehabilitative programming opportunities available within the BOP. Mr. Fleet is amenable to treatment. He recognizes that his criminal conduct stems from his serious drug addiction. Despite his longstanding substance abuse problem, Mr. Fleet has never had substantial drug treatment, and he is eager to participate in an intensive treatment program. He is particularly interested in RDAP.[16] RDAP is available at many BOP facilities and, as discussed above, other BOP programs have been identified and suggested to Mr. Fleet to help aid his transition back to society.

## CONCLUSION

For all of these reasons, and such others as may appear to the Court in light of the record as a whole, Mr. Fleet respectfully requests that the Court impose a sentence of 17 years of incarceration, followed by a term of supervised release, and an order of restitution. Mr. Fleet also respectfully requests the Court recommend participation in the RDAP program.

---

[16] Mr. Fleet understands that given the nature of his charges, he will not be eligible for the early release benefit of the RDAP program, but his primary focus is the therapeutic and rehabilitative aspects of the program.

15

Respectfully submitted,

**JON KARL MCREE FLEET**
By counsel,

Geremy C. Kamens
Federal Public Defender

by: /s/
Brooke S. Rupert, Va. Bar No. 79729
Assistant Federal Public Defenders
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0800 (telephone)
(703) 600-0880 (facsimile)
Brooke_Rupert@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2022, I will electronically file the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all attorneys of record.

Pursuant to the Electronic Case Filing Policies and Procedures, a courtesy copy of the foregoing pleading will be delivered to Chambers within one business day of the electronic filing.

By Counsel,

/s/
Brooke S. Rupert, 79729
Assistant Federal Public Defender
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314

(703) 600-0800 (T)

Brooke_Rupert@fd.org